UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SHANNA M. VALE

                Plaintiff,

- against -

GREAT NECK WATER
POLLUTION CONTROL
DISTRICT

                Defendant.

**COMPLAINT**

**ECF CASE**

**JURY TRIAL DEMANDED**

---

    Plaintiff Shanna Vale, by her attorneys The Law Offices of Jacob Aronauer and the Law Offices of Joshua Parkhurst, complaining of Defendant, alleges:

## NATURE OF ACTION

1. Plaintiff brings this action against Defendant Great Neck Water Pollution Control District ("GNWPCD" or "Defendant") for violations of Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAA").

2. Plaintiff, who for nearly ten years worked as a confidential secretary to the Board of Commissioners at GNWPCD, was discriminated against by Defendant after becoming disabled. After breaking her wrist, Defendant immediately assigned Plaintiff with physical tasks despite the fact that Plaintiff had never previously performed manual labor in the course of her employment for Defendant. Defendant, by engaging in this action, violated the ADA.

3. Plaintiff, upon reporting to Defendant that the assignments were against the recommendations of her doctor, was retaliated against by Defendant. Defendant proceeded to harass Plaintiff, bring Plaintiff up on baseless disciplinary charges that were without merit and significantly increased the overall amount of her job duties. These retaliatory actions, which were in further violation of the ADA, were designed to 'break Plaintiff's will" and force her resignation.

4. When Plaintiff refused to resign, Defendant then terminated Plaintiff.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over Plaintiff's ADA claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12117.

6. Plaintiff has exhausted all administrative remedies. Plaintiff filed the instant complaint within ninety days of receipt of a "right to sue" letter from the United States Equal Opportunity Commission ("EEOC"). Plaintiff received a "right to sue" letter from the EEOC on or about April 11, 2014.

7. Venue is proper within this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant, a government entity with capacity to sue and be sued, conducts its operations in this district, is subject to jurisdiction in this district, and therefore resides in this district pursuant to 28 U.S.C. § 1391(c)(2).

8. Venue is further proper within this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred within this district.

## PARTIES

9.  Plaintiff is a resident in Nassau County of the State of New York.

10. Defendant GNWPCD is responsible for cleaning water waste for approximately 16,000 residential and business residents for the five villages within Great Neck. GNWPCD is designated by the NYS Dept. of Environmental Conservation [NYSDEC] as a Grade III Wastewater Treatment Plant. Approximately 10 employees are assigned to the Plant and roughly seven employees work in the Defendant's office.

## STATEMENT OF FACTS

**Plaintiff Begins Employment at GNWPCD**

11. In late 2003, Plaintiff interviewed for the Civil Service exempt position of Secretary to the Board of Commissioners at GNWPCD (the "Position").

12. As part of the application process for the Position, Plaintiff was interviewed by the then three commissioners (the "Board") at GNWPCD: Deena Lesser, Jane Rebhuhn and David Lurie, respectively.

13. At this interview, Plaintiff was specifically advised by the Board that she would only report to, and take direction from, the Board members.

14. Plaintiff's predecessor, Ms. Sylvia Snyder, also advised Plaintiff, prior to Plaintiff's employment, that the Superintendent's office "has nothing to do with this office [Ms. Valve's post as Secretary to the Board] and that Ms. Valve was only to provide information if necessary to the Superintendent's office." Shortly after the interview, GNWPCD offered Plaintiff the Position.

15. Plaintiff began her employment at GNWPCD on January 12, 2004. Plaintiff's starting salary was $38,000.

**Job Duties of the Position**

16. Under § 41 of the New York Civil Service Law ("NYCSL"), a municipal board or commission is authorized by law to appoint a confidential secretary in a title that is exempt from the provisions of the Civil Service Law.

17. The Position was classified as exempt by the New York State Civil Service Commission on May 24, 1990.

18. On information and belief, the Position has remained classified as exempt since May 1990.

19. The duties of Plaintiff's civil service exempt title included, administrative and confidential work for the Board, communications with GNWPCD's consultants, suppliers, contractors, taxpayers and regulatory personnel and general day-to-day office administration and act as a liaison on behalf of the Board.

20. In addition, Plaintiff acted as the Health Benefits Administrator which involved processing all enrollments, changes in status and terminations, processing the Nassau County Civil Service Commission transactions and handling the annual election process for the election of Commissioner.

21. Since the Position was exempt, it did not include clerical work such as typing and dictation. In addition, under the NYCSL, the individual occupying the Position was not to report to officers or supervisors of GNWPCD. In fact, prior counsel to GNWPCD had advised the District that it was inappropriate to

4

assign clerical duties to the individual occupying the Position due to the Position's exempt classification.

22. Consistent with the NYCSL, when hired, the Board told Plaintiff that she was not to report to officers or supervisors at GNWPCD.

**Plaintiff's Employment at**
**GNWPCD from 2004 through May 2010**

23. While Plaintiff would regularly interact with other employees at GNWPCD, Plaintiff only reported to the Board.

24. Plaintiff only performed administrative and confidential work for the Board and communicate with various government agencies and officials. Plaintiff would type correspondence for the Board, take minutes at the weekly Board meetings and maintain the Board's confidential files. Plaintiff also performed all of the duties set forth in paragraphs "18" and "19".

25. Plaintiff's work performance was frequently complimented by the Board.

26. For example, David Lurie, a former Commissioner of the Board, wrote a letter praising Plaintiff's competency and work ethic.

27. In addition, due to her strong work performance, Plaintiff received yearly salary increases. Plaintiff's annual salary rose from $38,000 in 2004 to over $55,000 in 2013.

28. From 2004 through May 2010, Plaintiff never was subject to formal discipline by Defendant and never received a performance evaluation.

**Murphy and Leake's**
**Employment History with GNWPCD**

    29.    On or about 2007, GNWPCD hired Christopher Murphy ("Murphy") in the title of Superintendent—a position he currently occupies. As a Superintendent, Murphy's primary job duties are to handle GNWPCD's plant and monitor the plant's operators.

    30.    Murphy had previously been employed by William F. Cosulich Associates, an engineering firm, and had served as a consultant with GNWPCD.

    31.    On or about 2009, GNWPCD hired Thomas Leake ("Leake") in the official title of Business Manager. This Position was not filled prior to Leake becoming employed by GNWPCD. Rather, GNWPCD employed a part-time bookkeeper. As Business Manager, Leake handles the financial matters of the GNWPCD including accounts payable and the payroll.

**Plaintiff becomes Disabled**

    32.    On or about May 1, 2010, Plaintiff, who is right handed, broke her right wrist outside of work (the "Injury"). After suffering the Injury, Plaintiff became disabled under the ADA.

    33.    Due to her disability, Plaintiff was unable to work for approximately one week.

    34.    Also due to being disabled, Plaintiff initially had to wear a molded brace. Later on, she was able to wear a less cumbersome brace. All told, Plaintiff had to wear a brace for approximately one year after suffering the Injury.

    35.    The Injury impacted many of the Plaintiff's major life activities. It took Plaintiff significantly more time to bathe and get dressed in the morning, and

6

increased the amount of time it took her to prepare to leave for work. Plaintiff's driving ability was comprised as well and it took her much more time to reach her destination. Routine household chores, such as laundry, became much more difficult because Plaintiff could not lift or pull without great difficulty.

**Return to Work**

36. Shortly after suffering the Injury, on or about May 4, 2010, Plaintiff provided the Defendant with a medical from note from Orlin & Cohen Associates LLP (the "May 4th Medical Note"). Orlin and & Cohen is the medical group that treated Plaintiff after she became disabled.

37. The May 4th Medical Note stated that Plaintiff could return to work on May 10, 2010 for "light duty" and that she should "refrain lifting until further notice."

38. On information and belief, both Murphy and Leake saw and reviewed the May 4th Medical Note.

39. When Plaintiff returned to work after her injury and went into her office, she noticed that her papers were disrupted, personal items were missing and the lock to her desk draw had been broken.

40. On information and belief, Murphy and Leake went into Plaintiff's office and engaged in the actions discussed in the preceding paragraph or, in the alternative, directed employees at GNPWCD to engage in these actions on their behalf.

**Change in Job Duties**

7

41. Or about May 18, 2010, less than 10 days from after Plaintiff returned to work and becoming disabled under the ADA, Murphy completely changed Plaintiff's job duties.

42. Plaintiff, just days after breaking her wrist, had been assigned job duties performing labor-intensive tasks that would only aggravate Plaintiff's medical condition.

43. These job duties were previously performed by Ann Marie Martinez, who also has a clerical civil service title.

44. Plaintiff was now assigned to pull files, some of which were voluminous and heavy, scan documents and box (organize) files. In order for Plaintiff to box (organize) the files, Plaintiff had to carry the boxes downstairs to the file room for the purpose of archiving the files. These job duties previously were the clerk-typist's responsibilities.

45. In addition, through a memo, Murphy informed Plaintiff that she would now be assigned to technical data relating to the plant's pumping stations and monthly time sheets. This was previously performed by Murphy's assistant, Cary Rogers.

46. Rogers holds the civil service title of clerk typist.

47. Plaintiff was now also regularly assigned cleaning and janitorial duties. Specifically, Plaintiff was required to clean the conference room table as well as the kitchen area after lunch meetings. Plaintiff was also required to vacuum the hallway when the men in the plant tracked in dirt.

48. Prior to suffering the Injury, Plaintiff had never been assigned these above mentioned clerical and janitorial duties.

49. These new assignments were in direct response to the Plaintiff becoming Disabled. Plaintiff, exasperated as to why Defendant would suddenly change her job duties after such a significant injury, stated to Defendant Murphy "[w]hy are you doing this [change in job duties] to me?" In response, Defendant Murphy stated, "[b]ecause I can."

50. In addition, many of these assignments (which frequently were by e-mail from Murphy to Plaintiff) gave Plaintiff unrealistic deadlines that even an individual whom was **not** recovering from a recently broken wrist would be able to meet.

**Plaintiff is Required to Lift Heavy Objects**

51. Prior to the Plaintiff becoming disabled, Plaintiff was never responsible to box and carry files.

52. As noted earlier, immediately after suffering her injury, Plaintiff was forced to lift heavy boxes. In order to perform this task, Plaintiff attempted to utilize her right upper arm with her left hand to lift many of the larger, heavier files.

53. However, some of the files were simply too heavy for Plaintiff to lift and box as Murphy had directed Plaintiff.

54. Thus, on or about May 18, 2010, Plaintiff requested Leake for assistance to to lift a heavy file. In response, Leake became irritated and annoyed and repeatedly asked Plaintiff how much weight she could lift even though Plaintiff had just days earlier provided Defendant the May 4th Medical Note.

9

55. On July 13, 2010, Murphy sent Vale another e-mail that told her, in part, to file boxes despite the fact that Plaintiff was Disabled.

**Plaintiff Engages
in Protected Activity**

56. On November 2010, Plaintiff reported to Commissioner Lesser that Defendant had changed her job duties immediately after she suffered her broken wrist.

57. Specifically, Plaintiff informed Commissioner Lesser of the added responsibilities of lifting files despite the fact was now wearing a brace for her broken wrist despite providing the May 4th doctor's note that stated that Plaintiff could not lift heavy objects.

58. While Commissioner Lesser was sympathetic, Plaintiff's new job duties remained and, in fact, Plaintiff was retaliated against by Defendant.

**Retaliation through
Unfounded Disciplinary Charges**

59. The same month that Plaintiff went to Commissioner Lesser as to the manual labor assigned to her after becoming disabled, Plaintiff was brought up on baseless disciplinary charges that were without merit.

60. The very individuals that Plaintiff complained of, Murphy and Leake, respectively, brought Plaintiff up on these disciplinary charges.

61. Defendant brought Plaintiff up on disciplinary charges in retaliation for Plaintiff's protected activity.

62. The meritless disciplinary charges stemmed from Plaintiff's alleged lateness.

63. From January 12, 2004, up until April 2, 2010, Plaintiff's hours were 8:30 a.m. to 4:30 p.m. Plaintiff's hours were directed by the Board.

64. On or about early April, Murphy changed the Plaintiff's work schedule. Plaintiff's assigned hours were now 8:00 a.m. to 4 p.m.

65. When Plaintiff returned back to work in May, Plaintiff stated to Murphy that it would be very difficult for her to be at work at 8:00 a.m. due her disability.

66. Murphy, though, insisted that Plaintiff arrive at work at 8:00 a.m.

67. From May 2010 (when Plaintiff returned from the Injury) until November 8, 2010, Defendant never made any mention to Plaintiff as to issues or problems with her attendance.

68. On November 9, 2010, Plaintiff received a written reprimand from Defendant stating that Plaintiff had been late to work 49 times.

69. While GNWPCD monitors their employees time electronically, GNWPCD did not provide the dates and times that Plaintiff was allegedly late in this written reprimand.

70. Plaintiff reviewed and signed for the November 9, 2010 written reprimand. At this meeting, Plaintiff reiterated the fact that any lateness was caused due to her disability. Plaintiff once again requested that Defendant provide, as a reasonable accommodation, the opportunity to arrive to work at 8:30 a.m.

71. At no point did Defendant, despite being aware of Plaintiff's medical condition, offer Plaintiff as a reasonable accommodation the opportunity to continue to arrive at work at 8:30 a.m.

11

72. After receipt of the November 9, 2010 written reprimand, Plaintiff despite still being disabled, was never late except in the instances of extremely poor weather conditions.

73. During the Winter of 2010/2011, several employees at GNWPCD were regularly absent from work due to numerous snowstorms.

74. Unlike her colleagues, Plaintiff still went to work even during snowstorms. Plaintiff, though, was informed by Leake that if she could not come into work on time because of bad weather, she should not bother to come in.

75. After Plaintiff was terminated, Defendant produced a written reprimand dated January 26, 2011.

76. The January 2011 written reprimand also pertained to Plaintiff's alleged lateness.

77. Plaintiff never received the alleged January 2011 written reprimand while employed by Defendant. Plaintiff only became aware of the alleged January 2011 written reprimand after she had already been terminated.

78. Consistent with Plaintiff not receiving the January 26, 2011 written reprimand, Plaintiff never signed an acknowledgment that she had received the January 26, 2011 written reprimand. In contrast, Plaintiff signed for the November 2010 written reprimand.

79. As with the November 9, 2010 written reprimand, the alleged January 2011 written reprimand failed to contain the dates Plaintiff was allegedly late.

80. On information and belief, the total amount of times that Defendant claimed Plaintiff was late (6) in the January 2011 written reprimand was exaggerated

and also included times in which the only reason Plaintiff was late was due to extreme weather conditions.

81. For example, in the January 2011 written reprimand, Defendant criticized Plaintiff for allegedly being two hours late one day. If Plaintiff was in fact late on that day, it was only due to one of the large snowstorms that winter.

82. Plaintiff, due to her disability and/or engaging in protected activity, was a victim of disparate treatment by GNWPCD. None of Plaintiff's colleagues, despite their own lateness, were ever subject to discipline.

83. On October 1, 2011, Defendant sent Plaintiff a letter requesting that Plaintiff provide "updated information" from her health care provider. Defendant claimed that it needed this information so as to ascertain whether Plaintiff could perform the essential duties of her position with or without a reasonable accommodation.

84. On October 11, 2011, Plaintiff's doctor provided a response with respect to the form provided by Defendants. Plaintiff's doctor requested that Plaintiff be provided a support cushion for her chair and not lift more than 5 pounds or engage in any pulling.

**Harassment by Defendant**
**to Force Plaintiff's Resignation**

85. In a further attempt to force Plaintiff to resign because Plaintiff engaged in protected activity as well as because of her disability, Defendant began to harass Plaintiff at work.

86. For example, from 2004 through November 2012, Plaintiff had her own windowed office.

13

87. After suffering her injury, Plaintiff was required to sit in a smaller, inadequate workspace and share this workspace with a part-time employee.

88. Throughout Plaintiff's employment, Plaintiff would keep phone numbers, notes or post-its on her desk, all of which pertained to the workings of the plant, the Commissioners, government officials and other wastewater treatment plants and government agencies. This information was critical to facilitate her job as Secretary to the Board.

89. After becoming disabled and engaging in protected activity, Plaintiff was directed by Murphy and Leake to cease from keeping the tools mentioned in the previous paragraph necessary for Valve to perform her job. Murphy and Leake further informed Plaintiff that if she kept any of the above mentioned documents on her desk, she would be disciplined for insubordination.

90. In contrast, other employees such as Murphy's assistant Rogers, were permitted to continue to have notes, post-its and articles on their desks and around their workstations.

91. At one point, Defendant asked why Plaintiff had a metal organizer on her desk. Plaintiff responded that she kept the metal organizer on her desk to help her perform her job duties.

92. Shortly thereafter, Plaintiff arrived at work to find that the metal organizer on her desk to help her perform her job duties was missing. In addition, Plaintiff's personal notebook which contained pertinent information concerning her job duties, which was purchased by the Plaintiff with her own money, was

93. removed by Mr. Murphy. Defendant had removed the metal organizer without informing Plaintiff beforehand.

93. For her own benefit and to stay organized, prior to submitting documents to Murphy or Leake for their review, Plaintiff would mark a word document with the word "Draft" on the document and only presented Murphy and Leake with finalized documents ready for signature.

94. Upon ready for Murphy or Leake's review, Plaintiff would remove the word "Draft" from the respective document.

95. After Plaintiff's termination, Plaintiff became aware that Defendant used many of these "Draft" documents that Plaintiff had not provided to Defendant as examples of deficient work, falsely representing them as final versions of her work product.

96. On information and belief, Murphy and Leake obtained these draft documents by going through wastepaper basket or the paper recycling bin.

**Plaintiff Assigned**
**Additional Job Duties**

97. On November 16, 2012, Plaintiff was assigned over ten new job duties by Defendant. Murphy and Leake assigned Plaintiff these new job duties in a meeting in the presence of the three Board members.

98. These new job duties were clerical in nature and did not include any responsibilities of Plaintiff reporting to the Board.

99. For example, Plaintiff was now additionally required to prepare purchase orders, clean, opening and documenting mail, answer phone calls, order supplies and address visitors.

15

100. The above mentioned tasks were clerk-typist's responsibilities that had never been previously assigned to Plaintiff.

101. Due to the fact that Murphy and Leake were at the meeting, Plaintiff could not speak freely as she feared further retaliation from Murphy and Leake. Plaintiff's anxiety was based on Murphy and Leake's prior retaliation against Plaintiff in response to Plaintiff's protected activity in November 2010 when she spoke to Commissioner Lesser.

**Plaintiff is Terminated**

102. In December 2012, Commissioner Rebhuhn lost reelection to the position of commissioner after serving over ten years as Commissioner to Defendant. Commissioner Rebhuhn was the most actively involved Commissioner at GNWPCD in the Plant and the one most familiar with Plaintiff's performance.

103. Due to Commissioner Rebhuhn losing her reelection, only Lesser was still on the Board since Plaintiff's initial hiring by Defendant.

104. The next month, in January 2013, Plaintiff was terminated.

105. Although Plaintiff's termination was formally made by the Commissioners, the decision to do so was actually done at the behest of Murphy and Leake, as none of the commissioners in 2013 were directly familiar with Plaintiff's work performance.

106. Defendant immediately replaced Plaintiff with another employee (the "Replacement").

107. On information and belief, the Replacement was classified as Exempt and was given the position of Secretary to the Board of Commissioners.

108. The Replacement was placed in Plaintiff's former office.

109. On information and belief, the Replacement was assigned to perform administrative and confidential work for the Board and acted as a liaison on behalf of the Board for communications with consultants, suppliers and contractors.

## FIRST CAUSE OF ACTION
## Americans with Disabilities Act – Discrimination Based on Disability

110. Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "109" as if set forth fully herein.

111. Defendant GNWPCD, through its employees, unlawfully discriminated against Plaintiff in violation of the ADA.

112. Defendant, upon learning of Plaintiff's disability, discriminated against Plaintiff by changing Plaintiff's job duties (so as to aggravate Plaintiff's injury) as well as subject Plaintiff to harassment.

113. Defendant further discriminated against Plaintiff by terminating Plaintiff because of her disability.

114. Defendant, through the aforementioned conduct, has violated 42 USC § 12112 by discriminating against Plaintiff because of her disability.

## AS AND FOR A SECOND CLAIM
## Americans with Disabilities Act-Unlawful Retaliation

115. Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "114" as if fully set forth herein.

116. After Plaintiff objected to and reported the aforementioned unlawful conduct, Defendant retaliated against Plaintiff by subjecting Plaintiff to disciplinary

infractions without merit, harassment, further change in job duties, forced to share an office and ultimately her termination.

117. Defendant, through the aforementioned conduct, has violated 42 U.S.C. §12203 by retaliating against Plaintiff for her opposition to Defendant's unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(a) Declaring that Defendant is in violation of the Americans with Disabilities Act;

(b) Enjoining Defendant from engaging in any similar violation of the Americans with Disabilities Act;

(c) Awarding Plaintiff all lost wages and benefits pursuant to the Americans with Disabilities Act;

(d) Awarding Plaintiff compensatory damages pursuant to the Americans with Disabilities Act;

(e) Awarding Plaintiff Punitive Damages Pursuant to the Americans with Disabilities Act;

(f) Awarding Plaintiff reinstatement and other equitable relief, including but limited to front pay, pursuant to the Americans with Disabilities Act;

(g) Awarding Plaintiff costs and reasonable attorneys fees in this action, pursuant to the Americans with Disabilities Act; and

(h) Granting such other and further relief as this Court deems necessary and proper.

Dated: July 9, 2014
New York, NY

        Respectfully submitted,

**THE LAW OFFICES OF JACOB ARONAUER**

By:      */s Jacob Aronauer*
     Jacob Aronauer (JA: 9184)
     THE LAW OFFICES OF JACOB ARONAUER
     225 Broadway, Suite 307
     New York, NY 10007
     Telephone: (212) 323-6980
     Facsimile: (212) 233-9238
     jaronauer@aronauerlaw.com


**LAW OFFICES OF JOSHUA PARKHURST**

By:      */s Joshua Parkhurst*
     Joshua Parkhurst (JP5022 )
     Law Offices of Joshua Parkhurst
     11 Broadway, Suite 615
     New York, NY 10004
     Telephone: (201) 577-2644
     Facsimile: (212) 480 8560
     JParkhurst@gileslawfirmllc.com

     *Attorneys for Plaintiff*